UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| Wesley O. Terrill | ) | |
| | ) | |
| | ) | CASE NO.: |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | **COMPLAINT** |
| | ) | |
| Limestone College and | ) | |
| Walt Griffin, President | ) | |
| (In His Official Capacity) | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## **INTRODUCTION**

1.     Plaintiff Wesley Terrill (hereinafter referred to as "Plaintiff") brings this action to redress Defendants Limestone College and Walt Griffin, President (In His Official Capacity) (hereinafter referred to as "Defendants"), actions in discriminating against Plaintiff on the basis of race and retaliation.

## **JURISDICTION AND VENUE**

2.     The Court has jurisdiction over this action pursuant to 28 U.S.C. Section 1331 and 1343 and 42 U.S.C. Section 1981.  This Court also has pendant and supplementary jurisdiction over so much of this action as is based on state law.

3.     Venue is proper in the Spartanburg Division because the causes of action arose therein, the acts and practices complained of occurred there, and it is where the Defendant does business and may be found.

## **PARTIES**

4.     Plaintiff is an African American male citizen of the United States of America and resides in Gaffney, South Carolina.

5.     Defendant Limestone College is located in Gaffney, South Carolina.  Limestone College is an organization within the State of South Carolina and is legally organized and existing under the Code of Law of the State of South Carolina.

6.     Defendant Walt Griffin is President of Limestone College.

## STATEMENT OF CLAIM

7.     Plaintiff began employment with Defendants in August 2011 as Assistant Director for Extended Campus Classroom (hereinafter referred to as "ECC").  Additionally, Plaintiff has served as an Academic Advisor and Site Representative for Defendants.

8.     Since 2013, Plaintiff has also served as a Course Instructor for Defendants and has participated in a program titled, "Call Me Mister" (hereinafter referred to as "CMM").

9.     At all times during the course of his employment with Defendants, Plaintiff has performed his job duties with due diligence and without incident.

10.     At all times relevant to this lawsuit, Plaintiff believes and is informed that ECC's organizational chain is as follows: Dean of ECC, Director of ECC, Assistant Director of ECC (Plaintiff), Area Coordinator, Corporate Marketing Representative, and Student Services Coordinator.

11.     Plaintiff believes and is informed that Caucasian Area Coordinators, who rank lower than him as Assistant Director of ECC, have higher salaries than Plaintiff.  Plaintiff alleges this is a direct result of Defendants' efforts to discriminate against him based on his race.  Plaintiff voiced his concerns to Ms. Brenda Watkins, Human Resources Director for Defendants.  Ms. Watkins rebuffed Plaintiff and did not conduct an investigation.

12.     Plaintiff believes and is informed that Ms. Donna Hudson (WF) is Director for Extended Campus Classroom for Defendants. Ms. Hudson is Plaintiff's direct supervisor.

13.     Plaintiff believes and is informed that Dr. Mark Reger (WM) is Dean of Extended Campus Classroom for Defendants.  Dr. Reger is Ms. Hudson's direct supervisor.

14.     As Assistant Director for ECC, Plaintiff's responsibilities included facility management, lease management, budgeting and car fleet management.  Plaintiff handled these responsibilities efficiently and effectively.

15.     In June 2016, Plaintiff acted under the direction of Dr. Reger to facilitate the process of trading in two (2) of ECC's vehicles.  Plaintiff arranged for the vehicles to be transported from their respective locations to the dealerships.

16.     Mr. Wayde Dawson (WM), Vice President of Finance for Defendants, gave Plaintiff permission to trade the vehicles.  As a result, not much time had lapsed from when Plaintiff became involved in the process and when the vehicles were traded.

17.     Plaintiff informed Dr. Reger of the trade, but inadvertently failed to inform Ms. Hudson. As a result of the trade, Plaintiff received a newer 2016 vehicle as opposed to Ms. Hudson who had a 2015 vehicle.  Ms. Hudson's anger at not being privy to the trade was immediately apparent as communication with Plaintiff significantly deteriorated.  Ms. Hudson's animus towards Plaintiff increased and persisted to present.  Plaintiff was increasingly excluded from conversations pertaining to ECC business.  Ms. Hudson also significantly decreased Plaintiff's job duties (in facilities management, fleet management, and traveling) in direct retaliation.

18.     Defendants also removed a new ECC vehicle from Plaintiff's possession.  The vehicle was then put in a pool leaving Defendants to maintain control over the new 2016 vehicle.

19.     Hudson's significant decrease of Plaintiff's job duties reduced Plaintiff to working forty (40) hours per week where Plaintiff was accustomed to working (and receiving income based on working) fifty-five (55) to sixty (60) hours per week.

20.     A proposed executive order of the Fair Labor Standards Act (hereinafter referred to as "FLSA"), which was to take effect December 1, 2016, would mandate that companies pay overtime to exempt employees whose minimum salary was below a certain threshold.  In response, Defendants, through Ms. Hudson, implemented a timekeeping process. The timekeeping process proved to be a weapon in furthering Ms. Hudson's animus towards Plaintiff as Ms. Hudson had already significantly decreased Plaintiff's job duties.  Plaintiff now had to punch a time clock each day, was no longer able to contribute his time to ECC duties as he would have previously done, and because of the reduction in hours, Plaintiff was not qualified for exempt status.

21.     Plaintiff, defeated and not knowing what to do, complained of Ms. Hudson's racial discrimination and animus to Ms. Brenda Watkins (WF), Human Resources Director for Defendants.  Ms. Watkins casually dismissed Plaintiff's complaints stating that Ms. Hudson's behavior was due to the "stress of the FLSA preparation."  Ms. Watson then suggested that Plaintiff meet with Ms. Hudson and Dr. Reger, the people responsible for his stressful job atmosphere.  Plaintiff, suspect of Ms. Watkins' response and suggestion, scheduled the meeting nonetheless.

22.     Plaintiff's suspicions came to light during the meeting as Ms. Hudson attributed her change in behavior to the "stress of the FLSA preparation," the same words Ms. Watson used. Ms. Hudson continued to deny any change in her behavior and stated that "everything was ok." Contrary Ms. Hudson's racial animus intensified.

23.     During the same meeting and in retaliation for his internal complaints, Plaintiff was informed that Ms. Hudson would again be changing some of his job duties. At the conclusion of the meeting, instead of correcting Hudson's behavior, Dr. Reger implied that Plaintiff should let time heal Ms. Hudson's wounds when in fact Plaintiff was the victim of race discrimination and retaliation.

24.     In October 2016, Plaintiff met with Ms. Watkins to discuss his job duties in relation to the FLSA changes.  Plaintiff was then informed that he would no longer receive his base salary and supplemental income from CMM.  To Plaintiff's detriment, his base salary would now include both jobs.  Defendants had merged Plaintiff's job duties such that Plaintiff was to work part-time for ECC and 15 hours per week for CMM.  Plaintiff viewed this as direct retaliation for voicing his complaint to Ms. Watkins.

25.     Before these changes, Plaintiff's base salary was thirty-three thousand eight hundred dollars ($33,800) per year, and Plaintiff's income was supplemented with an additional seven thousand dollars ($7,000) per year of income from the CMM program.  In sum, Plaintiff earned approximately forty thousand eight hundred dollars ($40,800) per year.  When Defendants merged Plaintiff's job duties, they deprived Plaintiff of earning the supplemental seven thousand dollars ($7,000) per year through his work with the CMM program.

26.     Ms. Hudson also played a role in arbitrarily elevating the salaries of Plaintiff's Caucasian colleagues as she met with them in secret offering to advocate for raises on their behalf.  The salaries of Maria Kithcart  (WF) and Clay Young (WM) were arbitrarily elevated to the exempt threshold of forty seven thousand four hundred seventy-six dollars ($47,476) while Plaintiff's salary not only decreased, but because of Ms. Hudson's retaliatory reduction in hours, Plaintiff also did not qualify for exempt status.

27.     Plaintiff is informed and believes that Defendant's actions as of March 20, 2017 showed increased animus as:  Plaintiff has been excluded from calls regarding his job duties thus depriving him of additional compensation and additional opportunities for upward mobility, and Ms. Hudson refuses to communicate with Plaintiff regarding job related information as a result of his continued internal complaints of discrimination.  Additionally, as of March 20, 2017, Defendant has instituted a practice of singling out Plaintiff to follow a lunch schedule while simultaneously not requiring his Caucasian counterparts to do the same.

28.     As a result of Ms. Hudson's retaliatory and discriminatory actions, Plaintiff has lost supplemental income from his roles in the CMM program, his role as an Academic Advisor, and in his capacity as Site Representative resulting in a financial loss of about $10,000 per year.  This all due to his race and in relation to his complaints of on the job racial inequities, to include pay.

29.     On March 17, 2017, Plaintiff worked, as usual.  From March 20, 2017 through March 24, 2017, Plaintiff was out on sick leave per his physician's instruction and Plaintiff informed Defendant that he would be out of work.  As consequent, Plaintiff also notified Defendant on March 27, 2017 that he would be under the care of his physician.

30.     On March 28, 2017, via email, Plaintiff requested Family Medical Leave Act (FMLA).  As pretext, Defendant terminated Plaintiff's employment, effective April 3, 2017, with formal notice given on March 30, 2017; two (2) days after request of FMLA leave.

31.     Plaintiff signed a document on March 30, 2017, which was written on March 27, 2017, indicating that his final pay was to be on March 31, 2017, effective April 3, 2017 (termination date).  At all times, Plaintiff performed his job in a competent manner; Defendant acknowledges

4

that the termination was of no fault of his own, but Plaintiff's termination was simply a cost saving measure.

32.     Plaintiff contends that the Defendant, pretextually used 'cost saving measure' as there were no exigencies which would have eliminated Plaintiff position.  In addition, the Defendant did not allow me to accept another position nor apply to a lower job position, as I had been employed with them since August 11, 2011.

33.     The Defendant retained employees, of whom Plaintiff supervised, without eliminating their positions for the alleged cost saving measure.  Plaintiff contends that the Defendants' actions were retaliatory for Plaintiff voicing his internal complaints about racial issues and a racially hostile work environment.

<u>**FIRST CAUSE OF ACTION:**</u>
**Section 1981 Based on Race Discrimination**

34.     Each and every allegation set forth hereinabove is hereby repeated as fully incorporated herein.

35.     Plaintiff is a member of a protected group on the basis of his race.  Plaintiff was stripped of his job duties, was prevented from receiving exempt status, lost supplemental income, and has been singled out based on his race in violation of 42 U.S.C. Section 1981 and retaliation. Plaintiff is pretextually terminated on March 30, 2017 with an effective termination date of April 3, 2017.

36.     Defendant, by and through its agents, began a pattern and practice of racially discriminating against Plaintiff when it, and its agents, significantly decreased Plaintiff's job duties such that Plaintiff lost income and was prevented from exempt status while the job duties and corresponding salaries of Plaintiff's Caucasian colleagues were not decreased at all.  In fact, Defendants arbitrarily elevated the income of Plaintiff's Caucasian colleagues so they could maintain exempt status.

37.     Defendants again discriminated against Plaintiff when, it and its agents, merged Plaintiff's job duties, which deprived Plaintiff of his supplemental income while Plaintiff's Caucasian counterparts were not required to merge job duties and continued earning supplemental income.

38.     Defendants further discriminated against Plaintiff when, it and its agents, arbitrarily elevated the salaries of Plaintiff's Caucasian counterparts when Plaintiff's salary was not elevated and in fact had more seniority than his Caucasian counterparts.

39.     Plaintiff alleges that the on the job treatment and retaliation were pretextual.  Plaintiff alleges that the Defendant, through its agents, initiated discriminatory practices against Plaintiff based on his race when Defendant decreased Plaintiff's work hours; merged Plaintiff's job duties, and elevated the salaries of Plaintiff's Caucasian counterparts.

40.     Plaintiff voiced his concerns to Ms. Brenda Watkins, Human Resources Director for Defendants.  Ms. Watkins rebuffed Plaintiff and did not conduct an investigation.

41.     Defendant, and its agents, were reckless, wanton, and intentional in the discrimination of Plaintiff in the following particulars, to wit:

        a.     In decreasing Plaintiff's job duties as a means to prevent Plaintiff from obtaining exempt status;

        b.     In merging Plaintiff's job duties to discontinue Plaintiff's earned supplemental income; and

        b.     In arbitrarily elevating the salaries of Plaintiff's Caucasian counterparts.

42.     In failing to protect Plaintiff from racial discrimination, preferential treatment, or retaliation, Defendant, and its agents, acted with malice or reckless indifference to the federally protected rights set out under 42 U.S.C. Section 1981.

43.     Defendant violated 42 U.S.C. Section 1981 by allowing racial discrimination to exist in the workplace which violates a clear mandate of 42 U.S.C. 1981 that requires, "All persons . . . shall have the same right in every State and Territory to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."

44.     Defendants', and its agents, racial discrimination of Plaintiff has caused, continues to cause, and will cause Plaintiff to suffer substantial damages for pecuniary losses, lost wages, embarrassment, humiliation, pain and suffering, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

45.     Due to the racial discrimination by Defendant, its agents and employees, Plaintiff is entitled to injunctive relief and/or civil damages and punitive damages.

**SECOND CAUSE OF ACTION:**
**Retaliation**

46.     Each and every allegation set forth hereinabove is hereby repeated as fully incorporated herein.

47.     After Plaintiff informed Defendant, and its agents, about his concern of discrimination, Defendant, and its agents, retaliated against Plaintiff by practicing a continuing pattern of animus, harassment, and abusive attitudes.

48.     Defendant's, and its agents, unlawful retaliation towards Plaintiff has caused Plaintiff to suffer substantial damages for pecuniary losses, embarrassment, humiliation, pain and suffering, mental anguish, loss of enjoyment of life, and other pecuniary losses.

49.     Due to the retaliatory acts of the Defendant, its agent and employees, Plaintiff is entitled to injunctive relief and/or civil damages, back wages, plus interest, payment for lost wages, and punitive damages.

50.     Accordingly, Plaintiff is entitled to compensatory and punitive damages in the nature of the value of his loss wages and benefits, front pay, together with interest thereon, as well as liquidated damages, and his respective attorney's fees for the bringing of this action.

### THIRD CAUSE OF ACTION:
### Violation of Family Medical Leave Act (FMLA)

51.     Each and every allegation set forth hereinabove is hereby repeated as fully incorporated herein.

52.     At all times relevant to this lawsuit and pursuant to FMLA, Defendants were a covered employer under the Family Medical Leave Act (FMLA).  Defendants employed more than fifty (50) employees.

53.     Plaintiff was an employee of Defendants' and eligible to take FMLA leave.  Further, Plaintiff worked for Defendant at least twelve (12) months prior to when he needed leave and worked for at least 1,250 hours of service.

54.     Plaintiff contends that his rights under FMLA were violated when Plaintiff requested to take FMLA leave on March 28, 2017 and as a retaliatory act, Defendant, only 2 days after Plaintiff had requested FMLA leave on March 28, 2017, terminated Plaintiff on March 30, 2017.

55.     Defendant knowingly violated the requirements of FMLA and knowingly retaliated against Plaintiff by terminating him two days after requesting FMLA leave and after being on notice that Plaintiff had been under the care of his physician from March 20, 2017 to March 24, 2017 and again from March 27, 2017 through March 29, 2017.

56.     The aforesaid actions of Defendant – retaliatory against Plaintiff by terminating him 2 days after requesting FMLA leave – constitutes a violation of a clear mandate in violation of the Family Medical Leave Act of 1993 (42 U.S.C. Sec. 2601, *et seq.*).

57.     Accordingly, Plaintiff is entitled to compensatory damages in the nature of the value of his lost wages and benefits, front pay, together with interest thereon, as well as liquidated damages, and his reasonable attorney's fees for the bringing of this action.

### JURY TRIAL DEMANDED

Plaintiff requests a trial by jury.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that this Honorable Courts declare that the Defendant's actions complained of herein violated the rights guaranteed to the Plaintiff and issue its judgment:

(1)     Declaring the actions complained of herein illegal;

(2)     In favor of Plaintiff and against Defendant for all causes of actions in an amount which is fair, just, and reasonable, and for compensatory damages;

(3)     Issuing an injunction enjoining the Defendant, its agents, employees, successors, attorneys and those acting in concert or participation with the Defendant, and at its direction from engaging in the unlawful practices set forth herein and shown to be in violation of 42 U.S.C. Section 1981 and any other violations.

(4)     Awarding Plaintiff compensatory damages and punitive damages for each Cause of Action contained herein, which the jury should find appropriate as a result of the Defendants' unlawful discriminatory actions taken as the result of race and retaliation, including mental anguish, pain and suffering, harm to Plaintiff's economic opportunities, any back pay, front pay and future earnings with cost of living adjustments, prejudgment interest, fringe benefits, and retirement benefits;

(5)     Awarding Plaintiff his costs and expenses in this action, including reasonable attorney's fees, and other litigation expenses; and

(6)     Granting such other and further relief as may be just and necessary to afford complete relief to the Plaintiff as this Court may deem just and proper.

Respectfully submitted:

By:     _____s/Donald Gist_____
        Donald Gist (FED ID: 7178)
        Aaron Wallace (FED ID: 11469)
        *GIST LAW FIRM, P.A.*
        4400 North Main Street
        Columbia, South Carolina 29203
        Telephone: (803) 771-8007
        Fax: (803) 771-0063
        *Attorneys for Plaintiff*

April 11, 2017